United States District Court
Southern District of Texas
ENTERED
September 24, 2026
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

GALVESTON DIVISION

No. 3:19-cv-44

RYAN LYNN, ET AL., *PLAINTIFFS*,

v.

CITY OF TEXAS CITY, ET AL., *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court are the defendants' motions for summary judgment and to exclude Dr. Kenneth Eugene Lehrer's expert testimony. Dkts. 88, 86. The court will grant the motion for summary judgment in part and deny it in part. The court will deny the motion to exclude.

### I. Background

Ryan Lynn owns and operates Windsor EMS, a private ambulance company serving Galveston, Harris, Chambers, and Brazoria counties. Dkt. 85 ¶¶ 5, 13. In 2012, Texas City passed an ordinance requiring private ambulance companies to meet certain criteria to obtain an operations permit within the city. *Id.* ¶ 13; Tex. City, Tex., Code of Ordinances Title III, ch. 35,

§§ .11–.12. Private ambulance companies are also responsible for renewing their permits annually. Code of Ordinances Title III, ch. 35, § .13. The ordinance provides that renewal applications should be submitted "between December 1 and January 31" and that companies who "fail to renew their permit before January 31 of each year shall have their permit declared vacant and [be] removed from the transfer service rotation master list." *Id.* § .13(B). Operating an ambulance service with an expired permit is a violation of the ordinance. *Id.* § .13(A)(4).

Captain Wendell Wiley was hired as the city's EMS administrator and permit officer in 2015. Dkt. 85 ¶ 14; 86 at 3. The EMS administrator is responsible for receiving and issuing permit applications, inspecting ambulances, and "[d]evelop[ing] such reasonable regulations . . . as may be necessary for the proper enforcement and implementation of" the ordinance. Code of Ordinances Title III, ch. 35, § .10.

The plaintiffs allege that within a few months of obtaining this position, Wiley asked to be put on Windsor EMS's payroll. Dkt. 85 ¶ 14. Windsor refused due to "an apparent conflict of interest," which allegedly prompted Wiley to "revoke" Windsor's operating permit and "systematic[ally] harass" Windsor through "intimidation tactics" such as trespassing on company property, threatening Windsor employees with arrest for interference with

patient treatments, and interfering with its private business contacts. *Id.* ¶¶ 15–16. Windsor also claims it "faces revocation of" its state license and a hearing before the Texas Department of State Health Services ("DSHS") due to Wylie's "meritless and vexatious complaints." *Id.* ¶¶ 17, 30–31.

The city's explanation of what happened is vastly different: it claims it never "revoked" Windsor's permit because there was no permit to revoke. The defendants explain that Windsor "failed to submit a timely [permit] renewal application," so its previously held permit "automatically expired" under the ordinance. Dkt. 86 at 13. Despite its expired permit, Windsor "continued to operate an ambulance service within the [c]ity in violation of the [o]rdinance, leading the [c]ity to issue Windsor multiple cease-and-desist letters [and] written warnings." *Id.*

The plaintiffs sued the city and Wiley pursuant to the court's federal-question jurisdiction under 28 U.S.C. § 1331, claiming the defendants violated Windsor and Lynn's Fourteenth Amendment rights, engaged in unreasonable restraint of trade in violation of the Sherman Act, and tortiously interfered with private business contracts. Dkt. 1 ¶ 9; 85 ¶¶ 9, 38–44, 45–50, 51–58, 59–65.[1] The plaintiffs seek both monetary and injunctive

[1] This is not the first time the parties have brought their disagreements to court. The defendants allege DSHS pursued litigation against Windsor but later

relief, alleging that they have lost "more than $2 million per year" due to the defendants' actions. Dkt. 85 ¶¶ 17, 63, 76. The defendants filed a motion for summary judgment on these claims. Dkt. 86. The defendants have also filed a motion to exclude the expert testimony of Dr. Kenneth Eugene Lehrer, which the plaintiffs offer to show Windsor's economic damages. Dkt. 88.

## II. Motion for Summary Judgment

### A. Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). For each cause of action moved on, the movant must set forth those elements for which it contends no genuine dispute of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to offer specific facts showing a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956

"closed" it "without any action being taken against [the now plaintiffs]." Dkt. 86 at 14 n.3. Several misdemeanors were also allegedly issued against Lynn but later "dismissed under deferred adjudication agreements" or "in the interest[] of judicial economy." *Id.*

(5th Cir. 1993) (citation omitted).

The court "may not make credibility determinations or weigh the evidence" in ruling on a summary-judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Summary judgment serves to "dispose of factually unsupported claims and defenses." *Amaya v. City of San Antonio*, 980 F. Supp. 2d 771, 776 (W.D. Tex. 2013).

**B. Analysis**

**1. Lynn's Standing**

As a threshold matter, the court will address whether Lynn has standing to bring the claims asserted in this case. Lynn concedes that he has no standing to bring the Sherman Act and tortious-interference claims. Dkt. 95 at 35 n.10. However, Lynn maintains that he has standing to assert due-process and equal-protection claims because, as an employee of Windsor, Lynn suffered his own injury "as a direct consequence of Wiley's wrongful rejection of Windsor's renewal application." *Id.* at 30. The defendants argue that Lynn has no concrete and particularized injury and that Lynn is merely a "relative or bystander" to Windsor's claim. Dkt. 100 at 14. The court agrees

with the defendants.

Standing requires plaintiffs to show "three basic elements: injury in fact, causation, and redressability." *Adams v. City of Harahan*, 65 F.4th 267, 271 (5th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To establish injury in fact, a plaintiff must "assert his own legal rights and interests[] and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). As a general rule, "an action to redress injuries to a corporation, whether arising out of contract or tort, cannot be maintained by a stockholder in his own name but must be brought in the name of the corporation," *Schaffer v. Universal Rundle Corp.*,.397 F.2d 893, 896 (5th Cir. 1968) (internal citations omitted). This rule applies even "in cases where the individual is the sole stockholder." *Id.*

"[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Inclusive Comtys. Project, Inc.*, 946 F.3d at 655 (alteration in original) (quoting *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir.), *as revised* (Feb. 1, 2018), *cert. denied*, 139 S. Ct. 211 (2018)). "Thus, at summary judgment, [the plaintiff] can't rely on mere allegations; it must set forth by

affidavit or other evidence specific facts supporting standing." *Inclusive Comtys. Project, Inc.*, 946 F.3d at 655 (quotation omitted).

Here, Lynn has not shown that he "sustained identifiable losses as an individual as well as in his corporate role." *McDonald v. Bennett*, 674 F.2d 1080, 1086 (5th Cir. 1982) (distinguishing *Schaffer*, where plaintiff-shareholder suffered private losses apart from corporate harm); *see also Yousef v. Falcon*, No. 13-0542, 2013 WL 6816707, at *2 (W.D. La. Dec. 20, 2013) (shareholder lacked standing where his LLC "sued, in the same complaint and on the same theories, for the same harm"); *Three Legged Monkey, LP v. City of El Paso*, No. EP-14-CV-00260-FM, 2015 WL 12915683, at *3 (W.D. Tex. Jan. 8, 2015) (owner "lack[ed] standing to sue pursuant to section 1983 on the same legal theory as his business").

Lynn argues that he has standing to assert substantive- and procedural-due-process claims because the city's rejection of Windsor's application "denied Lynn and other Windsor employees the right to work in Texas City." Dkt. 95 at 30; *see also* Dkt. 95-1 at 28–9. This argument fails because (1) Lynn did not individually apply for a permit, and (2) the harm Lynn alleges in his due-process claims is identical to the harm alleged by Windsor—wrongful denial of Windsor's application to operate in Texas City. Dkts. 95-1 at 28–9, 86-1 ¶ 6.

On his equal-protection claim, Lynn asserts that he has standing because the denial of Windsor's application treated Lynn differently than the employees of other applicants. Dkt. 95 at 30. Lynn also argues that the defendants violated his equal-protection rights with a "campaign of retribution," which included "falsified probable[-]cause affidavits, extraordinary displays of force against Lynn, and vindictive, baseless complaints filed with state agencies." Dkt. 95 at 36.

In support of his disparate-treatment argument, Lynn cites David Zacherl's deposition testimony, which clarifies that the ordinance would not allow the city's EMS director to deny a timely application without reviewing its content. Dkt. 95-1 at 178:4–11, 182:25–183:5, 204:1–205:3. However, nothing about the cited Zacherl testimony shows that Lynn suffered an injury separate and apart from Windsor's when the city denied Windsor's permit application. Therefore, he cannot establish standing on that ground.

Similarly, the probable-cause affidavit—falsified or no—refers to Lynn only in his capacity as the Chief Administrator for Windsor EMS. Dkt. 95-1 at 499. There is no evidence in the record indicating that the warrant was ever served on Lynn, or that Lynn ever got arrested because of the probable-cause affidavit. *Id.* at 248:2–25. Accordingly, Lynn has not shown that the probable-cause affidavit caused him an individual injury, as well as an injury

in his corporate role with Windsor, and he cannot establish standing on that ground.

Next, the alleged "extraordinary displays of force" that Lynn refers to center around an incident where the police delivered a citation to Windsor's office while Lynn was out of town, as well as two occasions where Wylie allegedly threatened to arrest Windsor employees. *Id.* at 43:25–44:18, 303:16–305:11, 306:10–17, 307:16–308:17, 309:3–310:8. Notably, however, Lynn was not present for any of those events. Therefore, Lynn has not provided evidence for any specific displays of force against him personally, and he cannot establish standing for his equal-protection claim on those grounds.

Finally, Lynn asserts that the defendants violated his rights by filing "baseless complaints" with the Texas Department of State Health Services ("DSHS"). Wylie filed two complaints against Windsor with DSHS. *See* Dkt. 95-1 at 121:12–124:2, 531, 577. But because the complaints were specifically filed against Windsor EMS—not Lynn—none of Lynn's cited evidence shows that he suffered a separate injury from Windsor because of the DSHS complaints. Accordingly, the DSHS complaints also cannot provide Lynn with standing for his equal-protection claim.

Because Lynn has not shown that he suffered separate, individual losses from Windsor on any of the alleged constitutional violations, the court finds that Lynn does not have standing to pursue his Fourteenth Amendment claims under section 1983. Accordingly, the court grants defendants' motion for summary judgment on all claims asserted by Lynn.

**2. Windsor's Fourteenth Amendment Claims**

**i. *Monell***

A plaintiff may sue a municipality under § 1983—commonly called a *Monell* claim. *Edwards v. City of Balch Springs*, 70 F.4th 302, 307 (5th Cir. 2023). To succeed on a *Monell* claim, a plaintiff must show facts establishing "(1) an official policy (2) promulgated by the municipal policymaker (3) [that] was the moving force behind the violation of a constitutional right." *Id.* (citation omitted). "[T]he unconstitutional conduct must be *directly* attributable to the municipality through some sort of official action" or ratification. *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (emphasis added). Municipalities "cannot be found liable on a theory of vicarious liability or respondeat superior." *St. Maron Props., L.L.C. v. City of Hous.*, 78 F.4th 754, 759–60 (5th Cir. 2023). A city can be liable for constitutional violations when it has delegated policymaking authority to an official who violates a person's constitutional rights—but policymaking

authority "is more than discretion and far more than the final say-so on a given decision." *Three Legged Monkey, L.P. v. City of El Paso Texas*, 652 F. App'x 236, 239 (5th Cir. 2016), *as revised* (June 13, 2016) (quotations omitted).

Here, the defendants argue that Windsor has "failed to articulate or prove any unconstitutional policy or custom attributable to the final policymaker, which is the City Commission in this instance." Dkt. 86 at 23–24. Windsor responds that Texas City delegated total control of the ambulance permitting process to the fire department, making the city responsible for Wiley's unconstitutional actions. Dkt. 95 at 25. To the extent the city council was the relevant decisionmaker, Windsor argues for liability because the council failed to investigate Wiley's conduct, even after Lynn requested a meeting to discuss his ethical concerns. Dkt. 95 at 26 n.7. The court disagrees with Windsor on both points.

First, it is clear from the plain language of the ordinance that the city commission did not delegate total control of the permitting process to the fire department. Code of Ordinances Title III, ch. 35, §§ .10–.18; Dkt. 95-1 at 190. As discussed below, the ordinance specifically dictates the qualifications that applicants must meet to receive a permit, the dates when the EMS administrator can accept applications, and the procedures for filling vacant

permit spots. *Id.* §§ .12–.13. The ordinance only allows the permit officer to develop reasonable regulations "subject to the approval of the City Commission." *Id.* § .10(H). Additionally, the ordinance would not permit the EMS director to refuse a timely application without reviewing its content. Dkt. 95-1 at 204. Therefore, the council did not delegate total authority of the permitting process to the fire department, and Windsor cannot establish a *Monell* claim against the city on that basis.

Second, even if the city council wrongly refused to meet with Lynn or investigate Wiley's unethical conduct, that would not be sufficient to show an official policy that was the moving force behind violations of Windsor's constitutional rights. *Edwards*, 70 F.4th at 307. As the court discusses below, the rights violation in this case hinges on whether Wiley refused to accept a timely renewal application from Windsor. *See* discussion *infra* Section III.B.ii.1. Therefore, the council's refusal to meet with Lynn, which would have occurred after Wiley rejected Windsor's application, could not have been the "moving force" behind the constitutional violations presented in this case. Because Windsor has not presented any evidence of an official policy that led to the violation of its constitutional rights, the court grants Texas City's motion for summary judgment on Windsor's Fourteenth Amendment claims.

**ii. Fourteenth Amendment Due Process**

Wiley asserts that he is entitled to summary judgment on Windsor's substantive- and procedural-due-process claims, arguing that (1) Windsor had no property interest in a Texas City EMS permit, (2) the city ambulance-permitting ordinance is rationally related to a legitimate government interest, and (3) Windsor failed to plead that any city process was constitutionally deficient. Dkt. 86 at 16–21.

**a. The Timing of Windsor's Renewal Application**

Windsor's due-process claims largely hinge on whether Windsor has a protected property interest in a Texas City EMS permit. *See Giles v. Shaw Sch. Dist.*, 655 F. App'x 998, 1003 (5th Cir. 2016) ("To establish a substantive or procedural-due-process claim, [the plaintiff] must show that []he was deprived of a constitutionally protected liberty or property interest."). The answer to that question depends on the facts surrounding Windsor's renewal application—and whether Windsor allowed its permit to expire—which the parties polemically dispute. Dkts. 86 at 16–18, 95 at 12–16, 100 at 2–6; *see Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012) (holding that permits typically qualify as property interests once they are issued).

In the amended complaint, Windsor states that the company narrowly missed the renewal application deadline. Dkt. 85 ¶¶ 15, 23 ("On February 1st,

2017, less than 24 hours after the published deadline, [the plaintiff] filed a renewal application for the Windsor EMS Texas City permit."). However, in Windsor's response to the motion for summary judgment, Windsor asserts for the first time that it attempted to file the renewal application in person on January 31, 2017, and Wiley refused to accept it.[2] Dkt. 95 at 13–14. Given that fact, Windsor now maintains that Wiley wrongfully rejected Windsor's timely renewal application on January 31, 2017. Dkt. 95 at 12.

Wiley argues that the statements in Windsor's complaint constitute a judicial admission that Windsor filed the renewal application late. Dkt. 86 at 16–17; Dkt. 100 at 3. Since the complaint does not mention the attempted filing on January 31, 2017, the defendants also maintain that the court should not allow Windsor "to avoid summary judgment by changing the entire factual basis of [its] claim." Dkt. 100 at 3. The court will address both arguments in turn.

[2] Windsor cites to deposition testimony from Jeffrey Lynn and Armando Guerra, detailing a trip they made to the Texas City EMS office on January 31, 2017. Dkt. 95-1 at 353:13–358:2, 378:19–380:1. Both men testified that they attempted to deliver the renewal application in person, but Wiley returned the application and said he could not accept it. *Id.* at 361:15–362:2, 390:20–392:17. Jeffrey Lynn testified that the attempted in-person delivery happened on January 31, 2017, one day before the renewal deadline. *Id.* at 384:17–386:25. Windsor also provides a copy of a voided check for $3,100.00, made out to Texas City and dated January 25, 2017, as evidence that Windsor attempted to file the permit renewal on time. *Id.* at 693.

### 1. Windsor's Judicial Admissions

"A judicial admission is a formal concession in the pleadings or stipulation[] by a party or counsel that is binding on the party making [it]." *Mays v. Dir., Off. of Workers' Comp. Programs*, 938 F.3d 637, 647 (5th Cir. 2019) (citation omitted). "A statement made during the course of a lawsuit—even a statement made in a pleading filed with the court—should be considered a judicial admission only 'if it was made intentionally as a waiver, releasing the opponent from proof of fact.'" *Id.* (quoting *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001)). To qualify as a judicial admission, a pleaded statement must be, among other things, "deliberate, clear, and unequivocal." *Heritage Bank v. Redcom Lab'ys, Inc.*, 250 F.3d 319, 329 (5th Cir. 2001).

Here, Windsor has clearly and unequivocally admitted that the renewal application filed on February 1, 2017, was late. *See* Dkt. 85 ¶¶ 15, 23. However, nothing in the complaint constitutes a clear admission that Windsor did not *attempt* to file an application on time. Accordingly, the court finds that Windsor's judicial admissions do not preclude it from presenting evidence that Jeffrey Lynn and Armando Guerra attempted to file the renewal application in person on January 31, 2017.

### 2. New Facts Raised at Summary Judgment

"A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Green v. JP Morgan Chase Bank, N.A.*, 562 F. App'x 238, 240 (5th Cir. 2014). Therefore, "district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment." *Id.* (citing *De Franceschi v. BAC Home Loans Servicing, L.P.,* 477 Fed. Appx. 200, 204 (5th Cir.2012)); *see also Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) (finding waiver where a plaintiff alleged for the first time on summary judgment that sheriff failed to train officers "to deal with mentally unstable individuals," when the complaint had alleged failure to train officers "to avoid excessive force").

However, the Fifth Circuit has also determined that the Federal Rules "do not demand 'any magic words.'" *Barron v. United States*, 111 F.4th 667, 674 (5th Cir. 2024). Instead, federal pleading standards "only require plaintiffs to give fair notice of all claims brought against the defendant." *Id.* (finding claim for negligent undertaking was properly before the court—even though complaint did not expressly name it—because plaintiff pleaded facts going to every element of the claim).

Here, the court finds that the city and Wiley had fair notice of the due-process claims brought against them and the grounds on which those claims would rest. Windsor's complaint alleges that after the city hired Wiley as its EMS Administrator, Wiley twice requested a part-time position with Windsor. Dkt. 84 ¶ 14. The complaint also alleges that after Lynn refused both requests, Wiley revoked Windsor's permit and started causing Windsor "regulatory trouble." *Id.* ¶¶ 14, 22. Although the complaint does not specifically allege that Windsor tried to file its renewal application on time, Windsor is correct that the "pleadings themselves make clear Wiley's actions prior to February 1, 2017 . . . would be a central part of [Windsor's] claims." Dkt. 95 at 15.[3] Although Windsor has presented evidence of additional facts in its response, those facts do not create a "new theor[y] of liability not present in the complaint." *Green*, 562 F. App'x at 240. The defendants had fair notice that Wiley's conduct would be central to Windsor's claims, and

[3] The defendants argue that the plaintiffs "want to avoid summary judgment by changing the entire factual basis of their claim by raising novel factual grounds that have never appeared in their pleadings." Dkt. 100 at 3. To the extent the defendants use this argument to imply they had no notice of Windsor's timely filing attempt, their argument rings hollow. In April 2024, Windsor produced text messages between Lynn and Guerra, where Guerra described the failed attempt to file the renewal application. Dkt. 95-1 at 496–97. Defense counsel was also present for the depositions of Jeffrey Lynn and Armando Guerra, where she thoroughly questioned both men about the circumstances surrounding their attempt to file the application in-person with Wiley on January 31, 2017. *Id.* at 351:19–363:25, 384:17–397:17.

accordingly, the court declines to exclude evidence of Windsor's timely filing attempt.

**b. Substantive Due Process**

"The Fourteenth Amendment of the United States Constitution provides that no state shall deprive any person of 'life, liberty, and property, except by due process of law.'" *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016) (quoting U.S. Const. amend. XIV, § 1). To assert a substantive-due-process claim, a party must allege a constitutional deprivation and demonstrate that the state action lacks a rational relationship to a legitimate governmental interest. *Id.*

Here, Wiley argues that he is entitled to summary judgment on Windsor's substantive-due-process claim because Windsor cannot demonstrate (1) that it "ha[s] been deprived of a constitutionally protected right" or (2) that Wiley "acted arbitrarily, capriciously, or in a manner unrelated to a legitimate government interest." Dkt. 86 at 9–10.

**i. Windsor's Property Interest in the Permit**

To demonstrate a protected property right, a plaintiff must establish that he has a "legitimate claim of entitlement" to the interest alleged. *Nunez v. Simms*, 341 F.3d 385, 387 (5th Cir. 2003). "Because permits and licenses relate to the maintenance of a person's livelihood, suspension of *issued*

licenses involves state action that adjudicates important interests of the licensees." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012) (emphasis added). "Therefore, once issued, a license or permit cannot be taken away by the State without due process." *Id.*

As discussed above, the timing of Windsor's renewal application is key to the determination of whether Windsor had a protected property interest in the permit. The ordinance provides that issued EMS permits "shall be renewable on an annual basis upon the applicant's compliance with all requirements of this subchapter, including payment of the fees required." Code of Ordinances Title III, ch. 35, § .13. The ordinance provides an annual deadline of January 31 for submission of renewal applications, and it specifies that companies that fail to submit renewal applications by the deadline will have their permits declared vacant. *Id.* Texas City's representative testified that under the ordinance, "[i]f you had a permit and timely reapply, you will get your permit back." Dkt. 95-1 at 190. He also testified that the renewal applications could be filed by hand with fire-department employees, "[a]s long as it's before midnight of January 31st." *Id.* at 185.

Therefore, Windsor's legitimate claim of entitlement to a Texas City EMS permit hinges directly on whether Wiley rejected Windsor's renewal

application on January 31, 2017. If Windsor can prove that Jeffrey Lynn and Armando Guerra attempted to file a compliant renewal application on January 31, then Wiley did not have discretion to reject the application, and Windsor had a property interest in renewal. *See id.* at 190. Given the evidence Windsor has presented, a reasonable jury could find that Windsor attempted to file its renewal application before the deadline expired. Accordingly, there is a genuine dispute of fact for trial on the issue of Windsor's property interest in the Texas City EMS permit.

#### ii. Whether the Ordinance is Irrational and Wiley's Conduct Shocks the Contemporary Conscience

At the second step of this substantive-due-process analysis, the court must ask whether the challenged government action applies broadly or on an individualized basis. *Reyes v. N. Texas Tollway Auth., (NTTA)*, 861 F.3d 558, 562 (5th Cir. 2017). Government action that applies broadly gets rational basis review, while "government action that is individualized to one or a few plaintiffs" is subject to a "shocks the conscience" standard. *Id.* Accordingly, the court will ask whether the ordinance, which applies broadly, is rationally related to a legitimate government interest. *Reyes*, 861 F.3d at 562. And the court will ask whether Wiley's alleged behavior prior to February 1, 2017, which was directed at Windsor individually, "is so egregious, so outrageous,

that it may fairly be said to shock the contemporary conscience." *Cripps,* 819 F.3d at 232.

First, the defendants argue that Texas City "has a legitimate government interest both in ensuring that ambulance transportation services in the [c]ity meet certain criteria to protect the health, safety, and welfare of its citizens, and in not overburdening [c]ity personnel with administrative oversight." Dkts. 86 at 20; 100 at 8. Windsor, on the other hand, argues that the ordinance serves no rational purpose because (1) it allows only four ambulance providers to be licensed every year, (2) it irrationally prioritizes incumbents over new providers who could provide superior service, and (3) it calls for a random lottery when there are more applicants than available permits. Dkt. 95 at 20.

The three policies challenged by Windsor—limiting the number of licensed EMS providers, giving deference to incumbent applicants, and calling for a random lottery to select from qualified applicants—have a rational connection to limiting administrative burdens on city staff. Therefore, the court agrees with the defendants that the ordinance is rationally related to a legitimate government interest.

Second, Windsor argues that Wiley's conduct in "taking one look at a timely renewal application and handing it back to the applicant, without any

consideration of the merits" was irrational. Dkt. 95 at 19. However, to survive summary judgment, Windsor must present evidence that would allow a reasonable jury to conclude Wiley's actions were egregious enough to "shock the contemporary conscience." *Cripps*, 819 F.3d at 232. Windsor has not met that burden here.

The bar for conduct that "shocks the conscience" is very high. *See Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) ("a teacher's fabrication of sexual abuse against a student's father shocks the contemporary conscience"); *Conroe Creosoting Co. v. Montgomery Cnty., Tex.*, 249 F.3d 337, 341 (5th Cir. 2001) (county tax assessor's conduct in seizing and ordering sale of a company's facility would shock the conscience if proved that he (1) selected his friends as auctioneers; (2) notified state authorities of the sale; (3) signed a false affidavit in support of the tax warrant; and (4) authorized the "complete dispersal" of the company's assets without legal authority); *Anderton v. Texas Parks & Wildlife Dep't*, 605 F. App'x 339, 346 (5th Cir. 2015) (state officials killing the plaintiffs' deer did not shock the conscience because plaintiffs did not establish that the officials' conduct "was intended to injure them unjustifiably").

Here, at most, Windsor has presented evidence that Wiley refused to accept Windsor's timely in-person application without any consideration of

its merits. *See* Dkt. 95-1 at 353:13–358:2, 378:19–380:1. Even if Windsor proved at trial that Wiley's rejection was motivated by personal animus against Lynn, this behavior would not rise to the level of conduct that "shocks the contemporary conscience." *See Anderton,* 605 F. App'x at 346 ("[T]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme.").

Accordingly, the court finds that the Texas City ordinance is rationally related to a legitimate interest in administrative efficiency, and Wiley's alleged conduct does not shock the contemporary conscience. For those reasons, the court grants Wiley's motion for summary judgment on Windsor's substantive-due-process claim.

#### c. Procedural Due Process

A procedural-due-process claim involves a two-step inquiry: (1) "whether there exists a liberty or property interest which has been interfered with by the State" and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010). The Supreme Court has outlined three factors

for courts to weigh in considering whether procedural due process was adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

Here, Wiley argues that he is entitled to summary judgment on the plaintiff's procedural-due-process claim because (1) Windsor relies on unpleaded facts to show that Wiley rejected the timely renewal application, (2) Windsor has not demonstrated that it had a property interest in a permit, and (3) Windsor has "not contested the sufficiency of the procedures resulting in the alleged deprivation, making the adequacy of those procedures undisputed." Dkt. 100 at 9.

As discussed above, the pleadings provided the defendants with adequate notice that Wiley's behavior in "revoking" the EMS permit would be central to Windsor's claims. Dkt. 84 ¶¶ 14, 22. Therefore, Windsor is not legally precluded from presenting evidence that Wiley wrongfully rejected a timely renewal application. *See supra* Section III.B.ii.1. Similarly, Windsor's property interest in the permit depends on the facts surrounding the renewal

application, which are genuinely disputed and will be resolved by the jury at trial. *See supra* Section III.B.ii.2.

On Wiley's final argument, Windsor maintains that "Wiley's summary refusal of Windsor's application denied Windsor any opportunity . . . to be heard in response to Wiley's arbitrary refusal to accept or consider Windsor's renewal application." Dkt. 95 at 22. Evaluating this argument using the *Matthews* factors, the court finds that, if proven, Wiley's alleged behavior on January 31, 2017, deprived Windsor of a protected property interest without adequate procedures. *See Mathews,* 424 U.S. at 335. First, a city official's summary refusal to accept timely renewal applications might affect legitimate property interests in renewed permits. Second, denial without review risks the erroneous deprivation of permits to incumbent operators. Third, an official's refusal to accept a timely, compliant renewal application cannot serve any government interest because the Texas City ordinance does not contemplate or allow for such a denial. *See* Code of Ordinances Title III, ch. 35, §§ .13; Dkt. 95-1 at 190.

Accordingly, the court finds a genuine dispute of fact on whether Wiley's alleged conduct on January 31, 2017, deprived Windsor of a property interest without sufficient process. For that reason, the court denies Wiley's motion for summary judgment on Windsor's procedural-due-process claim.

### iii. Windsor's Fourteenth Amendment Equal Protection Claims

Wiley next alleges that he is entitled to summary judgment on Windsor's equal-protection claims, arguing that (1) Windsor cannot show it was treated differently from similarly situated ambulance providers, and (2) Windsor cannot show that Wiley lacked a rational basis for any disparate treatment. Dkt. 86 at 21–22.

To succeed on its equal-protection claim, Windsor must "show that (1) [it] was intentionally treated differently from others similarly situated and (2) there was no rational basis for the difference in treatment." *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 233 (5th Cir. 2012). Here, Windsor has presented evidence that it was treated differently from other similarly situated applicants. As established above, there is a genuine dispute of fact as to whether Wiley rejected Windsor's timely renewal application, while still accepting the applications of other incumbent ambulance operators. Dkt. 95-1 at 353:13–358:2, 378:19–380:1.[4] The defendants have failed to offer any

---

[4] At this stage, this showing is sufficient to establish a fact question on whether Windsor was treated differently from other similarly situated ambulance operators. However, the court notes that the other evidence Windsor presents—of citations, a probable-cause affidavit, and complaints filed with the state—does not establish a fact question on this issue. Dkt. 95 at 24. All of Wiley's conduct after February 1, 2017, occurred in the context of Windsor operating an ambulance in the city without a permit, and Windsor has not presented any evidence of similarly non-permitted operators that were treated differently. See Dkt. 86-1 ¶¶ 9-10.

explanation for Wiley's refusal to accept the application on January 31, 2017, so the court cannot evaluate whether there was a rational basis for the alleged differential treatment. *See Mikeska v. City of Galveston*, 451 F.3d 376, 381 (5th Cir. 2006) (finding no rational basis when the defendant "failed to offer any reason" for differential treatment). Accordingly, the court denies Wiley's motion for summary judgment on Windsor's equal-protection claim.[5]

**3. Sherman Antitrust Act**

The defendants argue that the *Parker* state action doctrine precludes Windsor's Sherman Act claim, and the court agrees. Dkt. 86 at 29. Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies which unreasonably restrain trade or commerce. *Affiliated Cap. Corp. v. City of Houston*, 700 F.2d 226, 235 (5th Cir. 1983). However, municipal acts "are entitled to immunity [on antitrust claims] if pursuant to a clearly articulated and affirmatively expressed state policy to replace competition with regulation." *Quadvest, L.P. v. San Jacinto River Auth.*, 7 F.4th 337, 346 (5th

---

[5] In a single paragraph at the end of his motion, Wiley asserts that the claims against him should be dismissed based on qualified immunity. Dkt. 86 at 39. For the reasons explained above, the court finds a genuine question of fact as to whether Wiley violated Windsor's constitutional rights. The court also finds that, if proven at trial, Wiley's conduct in refusing Windsor's timely renewal application was objectively unreasonable in light of clearly established law. *See Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021). Accordingly, the court declines to grant summary judgment on Windsor's constitutional claims based on qualified immunity.

Cir. 2021). To determine if municipal actions meet this standard, states must ask two questions: "(1) Does state law authorize the defendant to engage in the challenged conduct?; and (2) Did the state authorize the challenged conduct with an intent to *displace competition* with regulation or monopoly service?" *Id.*

Texas law grants broad authorization for municipalities in the state to "establish standards for an emergency medical services provider," and to license or otherwise regulate "any person who owns, operates, or controls any type of vehicle used on the public streets or alleys of the municipality for carrying passengers or freight for compensation." TEX. HEALTH & SAFETY CODE ANN. § 773.051 (West 2025); TEX. LOC. GOV'T CODE ANN. § 215.073 (West 2025). To find that the defendants are protected from antitrust scrutiny under *Parker*, Texas City's EMS permitting scheme only needs "to be a logical or reasonable consequence of the state's broad allocation of authority." *Cent. Ambulance Serv., Inc. v. City of Dallas*, 631 F. Supp. 366, 370 (N.D. Tex. 1986). Permitting schemes like the one at issue here—which are designed to maximize public safety while minimizing administrative burdens to city staff—are certainly a reasonable consequence of the broad allocation of authority granted to municipalities in Texas. Dkt. 86-1 ¶ 4. Accordingly, the defendants are shielded from antitrust liability under the

*Parker* state action doctrine, and the motion for summary judgment on Windsor's Sherman Act claim is GRANTED.

**4. Tortious Interference with Contract**

The defendants argue that there are no genuine disputes of material fact on Windsor's tortious-interference claim, and the court agrees. "Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person . . . who wrongly induces another contracting party to breach the contract." *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995). To succeed on a claim of tortious interference with contract, a plaintiff must show "(1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred." *Id.* at 795–96.

Windsor alleges that the defendants interfered with its existing contracts by wrongfully denying Windsor's renewal application, then "demand[ing] that Texas City businesses work only with permitted companies, causing Windsor to be unable to serve those contracts." Dkt. 95 at 34. In support of that contention, Windsor presents deposition testimony from Ryan Lynn that Windsor is now unable to service existing contracts

because Windsor is no longer permitted to operate in Texas City.[6] Dkt. 95-1 at 46:12–49:23, 313:7–314:6. Windsor also presents evidence that Wiley knew some of the facilities that Windsor did business with before losing the permit. *Id.* at 99:3–12. None of this evidence is sufficient to show that the defendants deliberately interfered with Windsor's existing contracts, especially because the ordinance—not Wiley—makes it a violation to operate an ambulance without a permit in Texas City. *See* Code of Ordinances Title III, ch. 35, § .11(A).

Windsor also alleges that, after Windsor lost its permit, Wiley pursued a Windsor ambulance while it carried a patient, which caused Kindred to terminate its contract with Windsor. Dkt. 95 at 35. Windsor cites to the declaration of Kindred representative Stephanie Madrid to support that assertion. Dkt. 86-4. However, in her declaration, Ms. Madrid specifically states that Kindred terminated Windsor's contract based on Kindred's own investigation of an "act or omission" by Windsor "which jeopardized the health or safety of [a] person." *Id.* ¶ 3–4. This termination occurred pursuant to a clause in Kindred and Windsor's agreement, meaning that Kindred was

[6] Lynn's allegation that Wiley called businesses in Texas City to tell them not to contact or do business with Windsor is inadmissible hearsay. FED. R. EVID. 802, 805; Dkt. 95-1 at 32:22–33:9.

not in breach when it terminated the contract. *Id.* Accordingly, Windsor has not provided evidence showing that the defendants induced Kindred to breach the Windsor contract. Because Windsor has not presented sufficient evidence of deliberate interference from the defendants, the court grants the motion for summary judgment on Windsor's tortious-interference claim.

## III. Motion to Exclude

The defendants have moved to exclude the expert report and testimony of Dr. Kenneth E. Lehrer, arguing that "his opinions are based upon unreliable methodology, speculation, an inadequate factual foundation, and, in some instances, are totally irrelevant." Dkt. 88 at 3.

### A. Legal Standard

Federal Rule of Evidence 702 provides that a party seeking to introduce expert testimony must show:

> [1] the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; [2] the testimony is based on sufficient facts or data; [3] the testimony is the product of reliable principles and methods; and [4] the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922

F.3d 285, 294 (5th Cir. 2019). The court's focus must rest "solely on principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). "This means the *Daubert* inquiry should not supplant trial on the merits." *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* As courts within this circuit have noted, generally, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Hub Texas, LLC v. Arch Specialty Ins. Co.*, No. 5:21-CV-180-H-BQ, 2023 WL 2776525, at *4 (N.D. Tex. Mar. 21, 2023).

**B. Analysis**

Here, the defendants argue that Dr. Lehrer's opinions should be excluded because he based many of his calculations on numbers provided by Alton Henderson, Windsor's Business Development Director. Dkt. 99 at 5. The defendants claim that Dr. Lehrer "relied exclusively upon a lay witness—Henderson—to provide the entire damage model, data, analysis and computation he used without independent verification," alleging that "Dr.

Lehrer simply attached Henderson's unproven and speculative damage model and incorporated it by reference in his report, parroting Henderson's opinions in his testimony." *Id.* at 6. The court disagrees with this characterization of Dr. Lehrer's testimony and report. First, Dr. Lehrer specifically testified that he did not blindly adopt the numbers provided by Henderson for his report. *See* Dkt. 88-1 at 22 (For example, when asked if he adopted Henderson's estimate for what Windsor would have made from Kindred, Dr. Lehrer responded, "I didn't adopt these. I have different numbers."). Second, Dr. Lehrer has explained that he needed to rely on financial reports from Windsor because the company is not publicly traded, meaning that he could not obtain numbers from SEC filings or other public records. *Id.* at 28. Accordingly, the court concludes that Lehrer reasonably relied on the figures provided by Henderson, and his report is based on sufficient facts and data. The defendants' concerns over Dr. Lehrer's reliance on Henderson may be properly addressed on cross-examination, and these concerns do not render Lehrer's testimony inadmissible. *See Hub Texas, LLC*, No. 2023 WL 2776525, at *4.

The defendants further object to Dr. Lehrer's testimony by arguing that his "assumptions are not reasonable and his methodology is not sound." Dkt. 99 at 10–11. In addition to deficiencies in Henderson's record collection, the

defendants argue that Lehrer's methodology is not sound due to several assumptions made in his report, which the court will address below:

- Dr. Lehrer assumed that Windsor would generate a profit from 2017 onward, "even though Windsor did not generate any positive net income for any year documented in his report until 2018, after Windsor lost its [c]ity permit." Dkt. 99 at 11. The court agrees with Windsor that Dr. Lehrer provided sufficient explanation for this assumption. *See* Dkt. 88-1 at 43–44 (explaining that Windsor was a growing company on its way to earning a positive rate of return).
- Dr. Lehrer assumed that "all of Windsor's service calls were completed and fully paid." Dkt. 99 at 11. The defendants suggest that this assumption was unreasonable, but that objection does not render Dr. Lehrer's opinions inadmissible. *See Lopez v. State Farm Lloyds*, 780 F. Supp. 3d 663, 672 (W.D. Tex. 2025) ("[W]here the issue is the degree of factual support or the reasonableness of the assumptions used, such objections go to weight, not admissibility.").
- Dr. Lehrer assumed that Windsor received no revenue for work performed within Texas City after losing its permit in 2017,

despite evidence that Windsor "continue[d] to operate illegally within the [c]ity after the vacatur of its permit." Dkt. 99 at 11. Again, this objection goes to the reasonableness of Lehrer's assumption, and it does not render his damages estimate inadmissible. *See Lopez*, 780 F. Supp. at 672.

- Dr. Lehrer assumed that Windsor's calls in Texas City would increase by 15% year-over-year, without analyzing "whether Windsor's business operations and infrastructure, [or] the [c]ity's population and medical community could even support that level of growth." Dkt. 99 at 12. The defendants might disagree with this assumption. But the court again finds that Dr. Lehrer adequately explained his reasons for it, and this assumption by itself does not render his testimony inadmissible. Dkt. 88-1 at 61–62 (explaining that Windsor's Texas City call volume had gone up by fourteen percent, sixty-two percent, thirteen percent, and fifteen percent in the four years before Windsor lost its permit in 2018).[7]

[7] The defendants also argue that Lehrer used the 15% assumption in the "computation of damages for the loss of ability to attract new business, which is not an appropriate or recognized category of damages." Dkts. 99 at 12, 88 at 19–

Finding that Dr. Lehrer's assumptions were made with sufficient facts and data, and that he used sufficiently reliable methods in reaching his conclusions, the court declines to exclude Dr. Lehrer's testimony because of the assumptions he made.

Lastly, the defendants argue that Dr. Lehrer's opinions should be excluded because "he did not consider alternate causes of damage," and because his report accounts for "stigma" damages, which are not recoverable in this case. Dkt. 99 at 12–15. First, it is widely accepted that "damages experts may, and often do, testify only about damages while assuming liability." *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 1319553, at *6 (E.D. Tex. Apr. 10, 2017). Accordingly, the court will not exclude Dr. Lehrer's report simply because he assumed that the defendants were responsible for Windsor's losses. Second, because the court's gatekeeping function applies "to principles and methodology," rather than conclusions, Dr. Lehrer's report is not inadmissible simply because it includes a category of damages that may ultimately be unavailable to Windsor. *Daubert*, 509 U.S. at 595. Windsor's success on its remaining

22. The defendants cite no relevant case law or authority to support this assertion, so the court declines to address it at this time.

claims, as well as Windsor's resulting damages, are properly "left for the jury's consideration." *Hub Texas, LLC*, 2023 WL 2776525, at *4.

After considering the parties' briefing, the court finds that (1) Windsor's designated expert report complies with Federal Rule of Civil Procedure 26(a)(2)(B); (2) Dr. Lehrer is qualified to offer expert testimony in this case; and (3) Dr. Lehrer's proposed testimony is based upon sufficient and reliable facts or data, is relevant, and would assist the trier of fact. Fed. R. Evid. 702. Accordingly, the court denies the defendants' motion to exclude.

* * *

For the foregoing reasons, the court DENIES the motion to strike. Dkt. 88. The court GRANTS the motion for summary judgment in part and DENIES it in part. Dkt. 86. The claims surviving summary judgment are Windsor's Fourteenth Amendment procedural-due-process and Fourteenth Amendment equal-protection claims against Wiley.

Signed on Galveston Island this 24th day of September, 2026.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE